Dalina CAMPBELL, o/b/o Kasey
R. CAMPBELL, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security,[1] Defendant.

No. 4:95CV165 FRB.

United States District Court,
E.D. Missouri.

April 11, 1996.

---

1. Pursuant to Federal Rule of Civil Procedure 25(d)(1) and the Social Security Independence and Program Improvement Act of 1994, Pub.L. No. 103–296, § 106(d), Shirley S. Chater, Commissioner of Social Security, is substituted in place of Donna E. Shalala as the proper party respondent.

Christopher W. Dysart, Donald L. Schlap-prizzi, P.C., St. Louis, MO, for Dalina Campbell.

Claire M. Schenk, Office of U.S. Attorney, St. Louis, MO, for Department of Health and Human Services.

## MEMORANDUM AND ORDER

BUCKLES, United States Magistrate Judge.

This cause is before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I. Procedural History

On October 6, 1992, plaintiff Dalina Campbell filed an application for supplemental security income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.*, on behalf of her minor son, Kasey R. Campbell. (Tr. 91–94.) Plaintiff alleged that Kasey became disabled one year prior to the application due to attention deficit disorder and hyperactivity. (Tr. 91.) On initial consideration (Tr. 82–85) and on reconsideration (Tr. 70–73), the Social Security Administration denied plaintiff's claim for benefits.

On October 1, 1993, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 42–64.) Plaintiff Dalina Campbell testified and was represented by counsel. (Tr. 44–64.) On February 25, 1994, the ALJ issued a decision denying plaintiff benefits. (Tr. 26–36.) After consideration of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 5–6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

### II. Evidence Before the ALJ

At the hearing on October 1, 1993, plaintiff testified in response to questions posed by counsel. Plaintiff testified that Kasey is seven years old. Kasey's date of birth is November 9, 1985. (Tr. 45.)

Plaintiff testified that until four years of age, Kasey suffered from ear infections,

throat infections and viruses. When Kasey was four, tubes were placed in his ears and his tonsils and adenoids were removed. Plaintiff testified that Kasey has had no physical problems since that time. Plaintiff testified that before entering school, Kasey was an active child, jumped off of furniture and was resistant to sleep. (Tr. 46.) Plaintiff testified that Kasey constantly moved, even while sleeping. (Tr. 46–47.)

Prior to entering kindergarten, plaintiff testified that Kasey did not have many friends because plaintiff could not let him go outside to play inasmuch as Kasey would then "take off." Plaintiff testified that, although Kasey did not have many friends, he had more at the present time than before kindergarten. (Tr. 50.)

Plaintiff testified that Kasey scored low on a pre-kindergarten exam because he was too interested with what other children were doing rather than paying attention to the test administrator. (Tr. 47–48.) Plaintiff testified that while in kindergarten, Kasey had problems such as not sitting still, interfering with other children, and constant loud talking. (Tr. 47, 49.) Plaintiff testified that Kasey also was impatient and did not like to wait his turn because of his impulsive behavior. (Tr. 50.) Plaintiff testified that Kasey's teachers diagnosed Kasey with behavior disorder and thought Kasey should be prescribed Ritalin. Plaintiff testified that she spent a considerable amount of time at the school after teachers had called her regarding Kasey's behavior. Plaintiff testified that the Special School District tested Kasey and diagnosed him with a behavior disorder. Plaintiff testified that thereafter, Kasey was placed in a "Resource Room" and in "Chapter I" but often was sent to the principal's office because he could not control himself. (Tr. 47.) Plaintiff testified that Kasey continued to "bouce[] off the walls" while at home. (Tr. 50.)

Plaintiff testified that Kasey receives one-on-one attention from a teacher in a Resource Room and thus is not distracted by other children. (Tr. 49.) Plaintiff testified that Chapter I assists Kasey with reading and math. (Tr. 49–50.) Plaintiff testified that Kasey was admitted to Chapter I be-

cause of his poor reading ability and comprehension. (Tr. 50.)

Plaintiff testified that while in kindergarten, Kasey began seeing Dr. Altman, a neurologist, so that Ritalin could be prescribed for Kasey. Plaintiff testified that Dr. Altman found Kasey to be a difficult child and to be hyperactive and suffering from attention deficit disorder. Plaintiff testified that Dr. Altman did not want to prescribe Ritalin initially but rather recommended a behavioral management course. (Tr. 51.) Plaintiff testified that she and her husband pursued this course of treatment, which involved therapy regarding appropriate ways of responding to Kasey's behavior to encourage Kasey to learn the proper way to act. (Tr. 51–52.) Plaintiff testified that this therapy was unsuccessful and that Kasey continues to act inappropriately. (Tr. 52.)

Plaintiff testified that Kasey's condition worsened between kindergarten and first grade in that Kasey became more hyperactive, was not listening or paying attention, and was constantly moving or talking. (Tr. 53–54.) Plaintiff testified that during the first week of first grade, Kasey was sent to the principal's office two or three times due to his behavior. Plaintiff testified that Kasey's teachers advised her that Kasey had difficulty completing his school work. (Tr. 54.) Plaintiff testified that in September 1992, after the first weeks of first grade, Dr. Altman prescribed Ritalin for Kasey to be given in the morning and at lunch time. (Tr. 54–55.) Plaintiff testified that she noticed improvement the first day Kasey took the medication in that Kasey had calmed down, was able to control himself, and was sitting for longer periods of time. (Tr. 55.) Plaintiff testified that this calm behavior took place at school and that Kasey became uncontrollable when he came home from school. (Tr. 55–56.)

Plaintiff testified that while Kasey was taking Ritalin, Kasey continued to have difficulty with homework because he could not read and understand the directions or write legibly. Plaintiff testified that Kasey continued to attend the Resource Room to receive one-on-one assistance in completing his work. (Tr. 56.) Plaintiff testified that Kasey con-

tinued to go to Chapter I to learn and understand reading and arithmetic inasmuch as the material was presented to him in a fun and interesting manner. (Tr. 56–57.) Plaintiff testified that Kasey got A's and B's in first grade but that this was because the teachers kept Kasey "on track" and helped him do his work. (Tr. 62.)

Plaintiff testified that Kasey continues to have problems during the current school year (second grade) in that he continues to interfere with other children and must sit apart from the other children so that he may concentrate on his work. (Tr. 57.) Kasey's art teacher recently informed plaintiff that Kasey was restless and impulsive in class. (Tr. 62.) Plaintiff also testified that Kasey cannot to his homework at home because his medication wears off causing Kasey to lose his attention span, to not control himself, and to be unable to read and comprehend directions. (Tr. 61–62.) Plaintiff testified that arrangements were being made for Kasey to do his homework in the Resource Room at school before his medication wears off and where a teacher could help him. Plaintiff testified that Kasey currently spends one-half hour in the Resource Room each day. Plaintiff testified that Kasey is also sent to the Resource Room to calm down if he becomes disruptive in the classroom. (Tr. 63.)

Plaintiff testified that Kasey has difficulty getting dressed for school in the morning because he dresses in a hurry. Plaintiff testified that Kasey will not properly bathe himself in the tub or brush his teeth if plaintiff is not with him. (Tr. 60.) Plaintiff testified that when Kasey takes his Ritalin during the day, he does not eat very much. Plaintiff testified that when the medication wears off during the evening, Kasey eats a great amount. (Tr. 61.)

Plaintiff testified that Kasey "bullies" his cousin who is one year younger than him. (Tr. 58–59.) Plaintiff testified that on one occasion during gym class, Kasey shook a child off of a climbing rope because the child was taking too long and Kasey wanted his turn. Plaintiff testified that within six months prior to the hearing, Kasey had problems at their apartment complex in that he had thrown mud balls at the side of an apartment building and lied when confronted about the incident, and that Kasey had crashed into an apartment maintenance van while riding a bicycle. (Tr. 59.)

Plaintiff testified that Kasey currently sees a psychologist and psychiatrist and takes Ritalin in the morning, at lunch time, and in the afternoon. (Tr. 57.) Plaintiff testified that Dr. Altman prescribed afternoon doses of Ritalin in February 1993 so that Kasey would cease inadvertently hurting his toddler sister. (Tr. 58.) Plaintiff testified that Kasey's psychiatrist prescribed Imipramine for Kasey for depression and to help him sleep. (Tr. 61.)

## III. Medical, Psychological and School Records [2]

Kasey underwent a kindergarten screening exam on May 15, 1991, at the Rockwood School District. Kasey had low scores with respect to number concepts, paper and pencil skills, language concepts, and visual skills. Kasey had average scores with respect to auditory skills and gross motor skills. (Tr. 236.)

On December 19 and 20, 1991, Kasey's kindergarten teachers evaluated Kasey's behavior. (Tr. 229–35.) The teachers' scores indicated that Kasey suffered from attention deficit disorder with hyperactivity. (Tr. 229, 232.)

On December 26, 1991, Kasey's mother went to St. John's Mercy Medical Center and discussed the possibility of Ritalin use for Kasey with respect to hyperactivity. It was noted that the school was concerned that there may be a problem with Kasey. (Tr. 135.) On January 2, 1992, Kasey was brought to St. John's Mercy Medical Center for an evaluation as to whether he had atten-

2. Records were submitted to and considered by the Appeals Council subsequent to the ALJ's adverse decision. (Tr. 280–395.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala,* 47 F.3d 935, 939 (8th Cir.1995); *Richmond v. Shalala,* 23 F.3d 1441, 1444 (8th Cir.1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

tion deficit disorder (ADD). It was noted that Kasey had been evaluated at school and that a trial period of Ritalin treatment was desired. Kasey was referred to the neurology department for ADD evaluation. (Tr. 136.) On January 14, 1992, Dr. Denis I. Altman from the neurology department examined Kasey. (Tr. 134–35.) Dr. Altman noted the school's concerns regarding Kasey's hyperactive, distractible and impulsive behavior. It was noted that Kasey had decreased attention and concentration abilities. Dr. Altman noted Kasey's academic performance to be delayed in that he was not reading and was having difficulty with class activities. (Tr. 135.) Examination showed Kasey not to know the days of the week or numbers. Dr. Altman noted Kasey to be hyperactive, impulsive and distractible. Dr. Altman concluded Kasey to have motor apraxia, a probable learning disability, and some features of ADD. Dr. Altman recommended that Kasey be referred to a behavioral management program. (Tr. 134.)

In January 1992 Kasey's Wechsler verbal IQ was measured to be 98. Kasey's performance IQ was measured to be 106. Kasey's full scale IQ was measured to be 102. (Tr. 200.)

On December 19, 1991, and January 21, 1992, the Special School District evaluated Kasey in response to school personnel concerns regarding Kasey's weak academic achievement and inappropriate school behavior. (Tr. 215–21.) Results of an intellectual assessment through the use of the Wechsler Intelligence Scale for Children—Revised showed Kasey's cognitive ability to be at the 55th percentile, within the average range of intelligence. Kasey's verbal and nonverbal skills were evenly developed. It was noted that Kasey displayed good school knowledge and reasoning abilities, although impulsivity affected some of Kasey's responses. Kasey showed strength in the areas of visual memory and sequencing. In all other areas of visual processing, Kasey's skills were adequate. It was noted that, at times, Kasey had difficulty restraining himself from interfering with the test materials. It was noted that Kasey expressed a dislike for writing. (Tr. 217.)

Results of testing regarding visual motor and memory skills through the use of the Beery Visual Motor Integration Test showed Kasey's skills to be developed within expectancies. Visual memory skills for number sequences were slightly below age expectancies. Inconsistencies were noted and Kasey exhibited reversal in writing numbers and poor organization on paper. It was noted that Kasey's attention affected his score. Screening with respect to personality factors showed Kasey to be immature and impulsive. It was noted that Kasey did not display the necessary insight or social skills to deal with authority figures, and appeared to communicate in a fantasy world. (Tr. 217.)

Kasey was also examined as to his educational, readiness and psychological process skills. (Tr. 217–18.) It was noted that Kasey had an erratic pattern of strengths and weaknesses. Auditory sequencing skills were weak. Kasey's skills in identifying locational/directional concepts were average. Visual discrimination (matching) skills were adequate. Visual memory skills for shapes and letter combinations were significantly weak. Visual-motor (copying) skills were below grade level expectancies. Kasey could correctly identify shapes and name coins but could not identify the coins' values. Kasey could recite the days of the week but not the months of the year in sequence. Kasey legibly wrote numbers 1 through 10 in sequence. Kasey could sing the alphabet in sequence. Basic understanding of sound/symbol relationships was poor. Kasey could not write the alphabet but copied letters fairly accurately. Kasey recognized no sight words. Kasey's written language skills were depressed. Quick, impulsive movements interfered with accurate copying. Readiness skills in letter identification, applied math problems and written dictation skills showed Kasey to be at the 4th percentile. General information skills measured at the 85th percentile. Kasey showed well-developed vocabulary and long term memory skills. Kasey showed average skills as to short term ability memory and visual processing. Visual discrimination and closure skills were adequate, however visual memory skills were hampered by limited concentration. In picture and oral

vocabulary development, Kasey showed above average skills. (Tr. 218.)

Observation in the classroom showed Kasey to partake in "off task behavior" sixty percent of the time. It was noted that Kasey exhibited disruptive behaviors not typical of most other students in the classroom. It was noted that Kasey's adaptive behaviors were a significant weakness and appeared to interfere with acquisition of learning. It was noted that Kasey was extremely impulsive and exhibited behaviors of a younger child. Kasey appeared unable to appropriately use school supplies and materials and was unable to remain seated during class. It was noted that Kasey's behavior appeared to improve with increased structure and that Kasey functioned best in a small group or with one-on-one interaction. (Tr. 219.)

Based on the evaluation, Kasey was found to be behavior disordered. It was noted, however, that Kasey had average potential with no areas of significant processing deficiencies. It was noted that Kasey's behavioral factors existed to a marked degree in comparison to his peers and had been operative for at least one year. It was noted that Kasey's behavior appeared to significantly affect his ability to function in the academic environment. It was found that Kasey's condition required special education and related services. Environmental, cultural and economic factors were not significantly related to Kasey's condition. (Tr. 220.) It was recommended that time be made for one-on-one interaction in large group settings; that behavioral management goals be set to help with impulsiveness, disorganization and restlessness; and that Kasey be allowed additional time to make transitions into a room. (Tr. 221.)

Kasey's parents consented to the use of Resource Services for the Behavior Disordered. (Tr. 202–14.) Under this program, Kasey participated in all regular academic and non-academic activities ninety-two percent of the time. (Tr. 202.) Kasey's remaining time, 150 minutes per week, was spent in a Resource Room with support from Special Education. (Tr. 202–03.) In addition, in-school suspensions were to be conducted in the Resource Room. (Tr. 209.)

Dr. Altman examined Kasey on February 11, 1992. Dr. Altman noted the evaluation performed by the Special School District and opined that Kasey had behavior disorder and features of ADD. Observation in a behavior disordered class was recommended as was participation in a behavioral management program. (Tr. 133.)

On April 28, 1992, Kasey underwent a Metropolitan Readiness Test. Kasey scored in the 57th percentile in auditory skills; the 32nd percentile in visual skills; the 42nd percentile in language skills; and the 27th percentile in quantitative skills. Overall, Kasey's pre-reading composite scores were in the 43rd percentile. (Tr. 312.)

On June 2, 1992, it was noted that Kasey's parents were involved with a behavioral management program but that Kasey's father had problems with compliance with the program. It was noted that Kasey had improved during the kindergarten school year. It was decided that Kasey would be re-evaluated after entry into first grade to determine whether treatment with medication would be necessary. (Tr. 132.)

On June 4, 1992, Kasey was promoted to the first grade. Kasey had achieved or was making progress in all areas of social development, academic development, and physical development except for indicating whether two words rhyme, attempting sound blending, and tying. (Tr. 313.)

On September 4, 1992, Kasey's mother received a note from Kasey's first grade teacher reporting that Kasey had been acting inappropriately in class and had been sent from the classroom on several occasions for hitting others. It was noted that Kasey was not able to attend to tasks without one-on-one assistance and not able to sit still for longer than a few seconds. (Tr. 248.)

On September 8, 1992, Dr. Altman noted that behavioral management had not been very successful. Kasey's teachers had reported that Kasey exhibited severe symptoms of ADD, such as inattentiveness and distractibility. Dr. Altman prescribed Ritalin for Kasey to be taken in the morning and at noon. (Tr. 131.)

Kasey was assigned to the Chapter I program on September 24, 1992, in which individualized support was provided in the areas of language, reading and math. (Tr. 254.)

In a daily activities report completed on October 11, 1992, Kasey's mother stated that Kasey wakes up at 6:30 a.m., dresses, watches cartoons, and then goes to school. Upon returning home from school after 3:00 p.m., Kasey either watches cartoons or plays outside until 6:00 p.m. (Tr. 237.) Kasey's mother stated that Kasey likes to play with toy weapons. (Tr. 237–38.) After dinner, Kasey either watches television or plays until 8:00 p.m. at which time he then does his homework. Kasey goes to bed at 9:00 p.m. (Tr. 237.) Kasey's mother indicated that Kasey loved his sister but that he sometimes gets excited and carried away with her and may inadvertently hurt her. (Tr. 237–38.) Kasey's mother stated that she must repeatedly tell Kasey to do things and must always know Kasey's whereabouts. (Tr. 239–40.) It was noted that Kasey's behavior around adults was appropriate and that he had no problems with adults. (Tr. 239.) Kasey's mother stated that Kasey had a best friend and that they played together all of the time. It was noted that Kasey also played with other children and his younger cousin. (Tr. 241–42.) Kasey's mother stated that Kasey was able to take care of his personal needs, such as bathing, brushing his teeth and toileting. It was noted that Kasey speaks very well. Finally, Kasey's mother opined that Kasey was "basically a good kid" and noted that Kasey shared well with others and had respect for others' property, but that Kasey just had problems controlling himself and paying attention for any period of time. (Tr. 241.)

On October 15, 1992, Kasey's first grade teacher completed a daily activities report relating to Kasey. (Tr. 245–47.) As to Kasey's cognitive abilities, it was noted that Kasey functioned best when he receives directions given directly to him and instant feedback. As to Kasey's communication skills, it was noted that Kasey had difficulty answering and explaining in a concise manner and expressing his thoughts in writing. It was noted that Kasey interacted age ap-

propriately with his peers and with adults. As to motor development, it was noted that printing and coloring took a lot of concentration. As to social functioning, it was noted that Kasey told imaginative stories, liked to be around others and fit in well. (Tr. 245.) Kasey related well with older adults. As to concentration, persistence and pace, it was noted that Kasey needed individual attention when presented with many problems at once or when required to write about a subject. It was noted that with constant praise and encouragement, Kasey worked hard to complete a task. Special adaptations made for Kasey included repeating directions, visual and auditory instructions, preferential seating, reduced assigned work, and written rather than oral instructions on certain assignments. (Tr. 246.)

On November 10, 1992, Kasey's first grade teacher reported to Kasey's mother that Kasey had significantly improved. Kasey was able to sit and attend to paper-pencil tasks and was able to complete assignments. Kasey was attending to written forms of words and complete sentences as well as displaying confidence in his abilities in reading and math. It was reported that Kasey's behavior had improved in that Kasey was more aware of his actions in the classroom and seemed to have more impulse control. (Tr. 249.)

On November 10, 1992, Dr. Altman noted Kasey to be responding well to his medication and that the school reported improvement. Dr. Altman noted, however, that Kasey continued to be very impulsive and distractible. Kasey was to continue taking Ritalin. (Tr. 129.)

On November 10, 1992, in response to an inquiry by the Social Security Administration, Dr. Altman diagnosed Kasey with ADD and learning disability. (Tr. 189–90.) Dr. Altman noted Kasey to have mild motor clumsiness with mild difficulty with fine finger movement. Dr. Altman opined that Kasey was not functioning age-appropriately in the areas of fine and gross motor, sensory, communication, cognitive, and social/emotional skills. Dr. Altman stated that Kasey's home environment was affected by Kasey's ADD; that Kasey's school environment was affected by Kasey's behavior difficulty; and

that Kasey's playground environment was affected by Kasey's learning disability. (Tr. 189.)

On November 17, 1992, Kasey underwent a psychiatric evaluation conducted by Dr. Pearl C. Ulett. (Tr. 177–87.) Dr. Ulett noted that Kasey had been taking Ritalin since September 1992. (Tr. 179.) It was noted that Kasey's parents were going through divorce proceedings and that Kasey's mother had recently received threats from Kasey's father. Kasey had good vocabulary but tended to skip from subject to subject. (Tr. 180.) Kasey was restless when sitting in a chair and was self-distracting. (Tr. 180.) Kasey showed logical thinking. Dr. Ulett noted Kasey's thoughts to exhibit a constant theme of someone being after him and fear of being hurt. It was noted that Kasey had trouble making friends at school. Kasey had an average range of intellectual ability. Dr. Ulett noted Kasey not to be clinically depressed and to be in contact with reality and oriented as to person, place and time. (Tr. 181.) Dr. Ulett diagnosed Kasey with moderate Attention Deficit–Hyperactive Disorder (ADHD) which had improved with medication. Dr. Ulett noted Kasey to be from a long-term dysfunctional family which was presently in crisis. (Tr. 182.) Dr. Ulett recommended that Kasey continue on medication and receive supportive psychotherapy for his condition and family crisis. It was also noted that Kasey's mother needed legal and social work assistance relating to the family crisis. (Tr. 183.)

On December 23, 1992, counselors from the Special School District opined to the Social Security Administration that it was in Kasey's best educational interest that he continue taking Ritalin. (Tr. 244.)

On January 15, 1993, Kasey received a good progress report from school regarding his behavior and study skills. It was specifically noted that "Kasey continues to exhibit excellent improvement in all areas. He is rapidly learning grade-level skills, and his report card reflects so with all A's and...." (Tr. 222.)

On January 20, 21 and 25, 1993, Kasey underwent testing to determine his mathematical abilities. Kasey's scores placed him in the 50th percentile and were equivalent to the grade level of 1.4, which was noted to be Kasey's actual grade level in school. (Tr. 225.) Performance on the Woodcock Reading Mastery Test showed Kasey to have a reading level at a grade level of 1.4. (Tr. 224.)

On January 28, 1993, the Special School District recommended continued Resource Room placement in addition to Kasey's regular education classroom. (Tr. 192–98.) It was noted that Kasey had average cognitive functioning and that his behavior had markedly improved during the previous year. It was noted that Kasey enjoyed one-on-one attention and well-developed peer relationships. Kasey's current classroom reports were above average. (Tr. 194.) It was noted, however, that Kasey continued to need assistance with task completion and learning basic grade-level skills and that Kasey benefited from a highly structured classroom and small group settings. (Tr. 193, 197.)

In a letter dated February 4, 1993, Kasey's first grade teacher noted Kasey's behavior to have improved with medication. It was noted that Kasey no longer needed behavior management and had improved self-esteem. It was also noted, however, that Kasey continued to be more distractible than the other students and had difficulty independently completing work assignments. (Tr. 243.)

On February 9, 1993, Dr. Altman noted Kasey's behavior to have improved but that Kasey continued to exhibit impulsiveness and distractibility. Examination showed Kasey to have mild difficulty in fine finger movement. Dr. Altman noted Kasey to have some response to Ritalin but also to need behavioral management as well as resource help. Dr. Altman prescribed a late-afternoon dose of Ritalin for Kasey in addition to the morning and noon doses. (Tr. 128.)

In April 1993, Kasey underwent an achievement test which showed him to be below average in reading comprehension, concepts of numbers and mathematics applications. (Tr. 314–15.) Kasey had average scores in word study skills, mathematics computation, environment, and listening. (Tr. 315.)

On June 8, 1993, Dr. Altman noted Kasey's ADD behavior to have deteriorated. It was noted that Kasey's father had recently been arrested and had been abusive and drinking alcohol. Kasey had received A's and B's at school and was doing well on Ritalin. Dr. Altman noted Kasey to need behavioral management and possible psychiatric care. Kasey's prescription for Ritalin was refilled. (Tr. 271.)

Therapist Anita R. Pozsgay examined Kasey at Child's Mental Health Services on June 15, 1993. (Tr. 351–53.) Kasey's troubled family history was noted, including physical and verbal abuse by Kasey's father. (Tr. 351, 352.) Kasey announced that he was "into fighting." (Tr. 352.) Therapist Pozsgay noted Kasey's behavior and language to be age appropriate. Kasey's academic performance and behavior in first grade were noted. Therapist Pozsgay noted that Kasey had been diagnosed by the Special School District as behavior disordered and that Kasey possessed average potential in cognitive abilities. (Tr. 352.) Therapist Pozsgay assessed that Kasey had experienced repeated physical and psychological intrusions into his and his mother's "safe space" by his father and diagnosed Kasey with ADHD and Overanxious Disorder. It was recommended that Kasey undergo psychiatric evaluation and that Kasey's parents undergo counseling. (Tr. 353.)

In a letter dated August 1993, Kasey's first grade teacher described Kasey's difficulty with impulse control and aggression toward his peers toward the beginning of the previous school year. It was noted that Kasey had above average intelligence but that his behavior interfered with completion of tasks. (Tr. 253.)

On August 30, 1993, Kasey's mother informed Dr. Altman that Kasey was seeing a private psychiatrist who had prescribed Imipramine for Kasey to take at bedtime. (Tr. 270.) In a letter dated September 7, 1993, Dr. Thomas A. Daniel, a child psychiatrist, anticipated increasing Kasey's dosage of Imipramine and requested a recent EKG so that potential cardiac side effects could be avoided. (Tr. 268, 365–66.) On September 14, 1993, Dr. Daniel noted Kasey to be afraid of everything. (Tr. 369.) It was noted that Kasey had few friends and associated better with younger kids. Kasey was to continue taking Ritalin and Imipramine. (Tr. 370.)

On September 16, 1993, Child Mental Health Services evaluated Kasey's case. It was noted that Kasey had been diagnosed with ADHD and Overanxious Disorder. Concern was expressed for Kasey's safety due to his parents' problems. It was recommended that Kasey be admitted to the "Rainbow's Group" and receive chemotherapy. It was also recommended that Kasey's mother receive parent counseling and therapy. (Tr. 350.)

On September 21, 1993, Dr. Daniel noted Kasey to have some difficulty at school with respect to talking and increased activity. Kasey stated that he could not sleep and was having nightmares. Dr. Daniel diagnosed Kasey with dysthymia and ADHD and increased Kasey's dosage of Imipramine. (Tr. 371.)

On September 23, 1993, Kasey's second grade art teacher expressed "very much" concern with Kasey's behavior in that Kasey was restless in the "squirmy" sense, was overly sensitive to criticism, disturbed other children, was excitable and impulsive, denied mistakes or blamed others, and was easily frustrated with his efforts. (Tr. 252.)

On October 5, 1993, Kasey's mother reported to Dr. Daniel that Kasey goes to sleep easier but awakens during the night. It was noted that the school reported that Kasey was becoming aggressive and very distracted. Dr. Daniel noted Kasey's mood to be improving. Dr. Daniel diagnosed Kasey with dysthymia and ADHD and continued Kasey on Ritalin and Imipramine. On October 12, 1993, Dr. Daniel increased Kasey's prescribed dose of Imipramine. (Tr. 372.) On October 26, 1993, Dr. Daniel noted Kasey's condition to be stable, although it was noted that Kasey was afraid of the dark and was afraid to play for fear of getting hurt. Kasey was to continue with his prescribed medications. (Tr. 374–75.)

In a Conference Report dated October 20, 1993, Kasey's second grade teacher noted Kasey's social skills to be improving. It was

also noted, however, that Kasey needed to progress in areas of responsibility and ownership. (Tr. 292.)

Kasey's first quarter progress report showed Kasey to be functioning at a skill level below second grade. (Tr. 281.) Kasey's second grade teacher expressed concerned in areas of comprehension, independent reading, writing processes, use of correct punctuation, social development and work habits, valuing currency, and art. However, Kasey was showing progress in or had achieved skills relating to word recognition, using correct capitalization, spelling, handwriting, listening and speaking, social studies and science, following directions, number relations, problem solving, exploring data, interpreting calendars, music, physical education, health, and positively contributing to art class. (Tr. 281–83.) Kasey's progress report from the Resource Room showed Kasey to be making adequate progress in behavior/study skills and good progress in perceptual skills. It was noted that Kasey's behavior was "excellent" in the Resource Room and that he performed better in small groups. (Tr. 284.)

On November 9, 1993, Child Mental Health Services evaluated Kasey's case. It was noted that combination of Kasey's medication was incorrect but that it was being titrated. It was noted that Kasey was pseudo-mature and seemed depressed at times. Kasey was diagnosed with Post–Traumatic Stress Disorder. Chemotherapy, parent counseling, individual psychotherapy, and Rainbow's Group were recommended. (Tr. 349.)

On November 16, 1993, Kasey's mother reported to Dr. Daniel that Kasey exhibited oppositional behavior. Kasey stated to Dr. Daniel that he missed his father. Kasey stated that he misbehaves for attention. Dr. Daniel noted that Kasey had improved regarding sleeping in his bed. Kasey was continued on his medications. (Tr. 377.)

Therapist Pozsgay met with Kasey on November 23, 1993. It was noted that Kasey continued to benefit from Ritalin but that behavior change was obvious when the medication wears off. (Tr. 354.)

On November 30, 1993, Dr. Daniel noted Kasey to continue to wake up early in the morning and to continue pestering his sister. Dr. Daniel noted Kasey's mood to be improved. No problems were noted from the medications. Dr. Daniel prescribed Clonidine for Kasey in addition to Kasey's regular medications. Dr. Daniel noted that he hoped to gradually remove Kasey from Ritalin with increased dosage of Clonidine. Kasey's Ritalin dosage was reduced. (Tr. 378.)

During a session on December 7, 1993, Therapist Pozsgay noted Kasey not to be entirely in touch with reality but that his activity level was okay. (Tr. 354.) Kasey's mother reported that the minimal dosages of Ritalin caused Kasey to become worse at school. Kasey's mother noted that Kasey appeared to be coming out of depression and slept better. (Tr. 355.) Therapist Pozsgay spoke to the counselor at Kasey's school who noted that Kasey had no office referrals and had no problems in special education. The counselor found Kasey's behavior to be much more appropriate than in kindergarten but expressed concern that Kasey was emotionally disturbed and was becoming disassociated. The counselor also worried that Kasey may break with reality. (Tr. 357.) Kasey's mother also reported to Dr. Daniel that Kasey was "off the wall" at school as a result of his decreased dosage of Ritalin. It was noted that Kasey was more sleepy on Clonidine but that he was more of a "pest." (Tr. 378.) Dr. Daniel increased Kasey's dosage of Clonidine and continued Kasey on his reduced dosage of Ritalin. (Tr. 379.)

On December 21, 1993, Kasey's mother reported to Therapist Pozsgay that Kasey was disruptive at home and that kids would not play with him. (Tr. 355.) Dr. Daniel continued Kasey on his same medications. (Tr. 381.)

On January 11, 1994, Kasey's mother met with Therapist Pozsgay and reported that Kasey was continually getting worse. Kasey did not want to go to school because kids said that he was retarded. (Tr. 356.) Dr. Daniel noted that teachers report Kasey to show some improvement with problem solving and that Kasey comes into class with friends. Dr. Daniel noted Kasey to continue waking

up early in the morning and during the night. Kasey expressed that he was worried about his father in jail and that he might get hurt. Kasey was continued on his medications. (Tr. 382.)

On January 20, 1994, Kasey's school counselor reported to Therapist Pozsgay that Kasey's behavior was appropriate and that Kasey was sharing his feelings. It was noted that Kasey's classroom teacher had no complaints. (Tr. 358.)

On January 28, 1994, the Special School District recommended that Kasey continue in the individualized education program with special education 150 minutes per week. (Tr. 286–90.) It was noted that Kasey responded well to structure, praise and encouragement and that Kasey enjoys one-on-one attention and works well in small groups. (Tr. 288.) It was also noted that Kasey exhibited average cognitive functioning with stronger performance skills. Kasey continued to show improvement in school behavior and in getting along with peers. (Tr. 288, 291.) Kasey was cooperative in learning and group reading. (Tr. 291.) There was some regression in fine motor skills and it was noted that academic skills had fallen dramatically during the previous two weeks. (Tr. 288, 291.) It was noted that Kasey had excellent or good progress with his previous objectives. (Tr. 289.)

Kasey's second grade teacher reported that in early February 1994, Kasey began exhibiting inappropriate behavior at school including crying at the mention of his name, shunning peers, picking fights with adults and students, refusing to work, and hiding in the bathroom. Kasey's grades had fallen to the lower ten percent of the class. Consultation with Kasey's mother showed no change in circumstances at home. (Tr. 293.)

On February 1, 1994, Kasey's mother reported to Therapist Pozsgay that Kasey was depressed because other children did not want him around. (Tr. 358.) It was noted that Kasey was lying to his father about his mother's relationships. (Tr. 358–59.) Kasey's school behavior was noted. (Tr. 359.) Kasey's mother expressed concern to Dr. Daniel regarding Kasey's medications. It was noted that Kasey's teachers felt that

Kasey had performed better while taking Ritalin. It was noted that Kasey's performance in school had declined. Dr. Daniel discontinued Kasey's use of Imipramine and increased Kasey's dosage of Ritalin. (Tr. 385.)

Kasey met with Therapist Pozsgay on February 15, 1994, and reported feeling better. It was noted that Kasey was calm and less "spaced out." On February 18, 1994, Kasey's special education teacher reported Kasey to be wonderful and opined that Kasey's mother was overwhelmed. (Tr. 359.)

Undated questionnaires were completed by Kasey's school nurse, second grade teacher, school counselor, special education teacher, and Therapist Pozsgay. (Tr. 318–47.) Plaintiff avers that these questionnaires were completed on February 25, 1994. (Pltf.'s Mot. Summ. Judg. at 13–15.) Responses to a question regarding Kasey's degree of inattention ranged from Kasey having a more than moderate degree of inattention to extreme inattention. As to Kasey's degree of impulsiveness, responses ranged from Kasey being somewhat impulsive to extremely impulsive. As to Kasey's degree of hyperactivity, responses concurred that Kasey was very hyperactive. (Tr. 318–47.) Kasey's second grade teacher noted that Kasey was at the second grade level with respect to reading and math but was slightly below the second grade level with respect to numbers. (Tr. 325.) Kasey's special education teacher noted Kasey to have average cognitive functioning. (Tr. 343.) The second grade teacher also noted that Kasey had made many friends, although there were minor peer conflicts at times. (Tr. 326–27.) The special education teacher opined that Kasey enjoyed his peers but does not positively interact with them. (Tr. 344.) The school counselor found Kasey to have difficulty with personal relationships and maintaining friendships. (Tr. 332.) Therapist Pozsgay opined that Kasey's family relationships were extremely impaired. (Tr. 338.) Kasey's second grade teacher noted that Kasey exhibited no destructive behavior toward himself, others or property, and that Kasey's primary problem was staying on task and avoiding distractions. (Tr. 327–28.) However, Therapist

Pozsgay noted Kasey to be "into fighting." (Tr. 339.) Kasey's special education teacher noted Kasey to take additional time to complete his tasks due to his lack of concentration. (Tr. 346.) The school counselor opined that Kasey would not perform well academically outside a highly structured setting which included medication, resource assistance, preferential seating, and other interventions. (Tr. 334.) Kasey's special education teacher opined that Kasey could not function in an age appropriate manner outside a highly structured environment inasmuch as he could not keep his hands to himself and talked loudly in the hallways and lunchroom. (Tr. 346.) The special education teacher also noted that Kasey spent 450 minutes per week in the Resource Room. (Tr. 347.) Therapist Pozsgay opined that Kasey could function in an age appropriate manner outside a highly structured setting if taking medication. (Tr. 340.)

Kasey's second and third quarter progress reports showed Kasey to be functioning at a skill level below second grade. (Tr. 296.) Kasey's second grade teacher expressed concern in areas of comprehension, independent reading, writing processes, writing structure, spelling in written work, oral presentations, study skills, organization, social development and work habits, problem solving, and valuing currency. However, Kasey was showing progress in or had achieved skills relating to word recognition, oral reading, recalling story elements, writing complete sentences, spelling, handwriting, listening and responding to oral presentations, social studies and science, following school rules and accepting responsibility, number relations, interpreting calendars, using standard and metric measuring tools, telling time, music, physical education, health, and art. (Tr. 296–98.)

In April 1994, Dr. Daniel noted Kasey to be sleeping better and to be performing better in school. It was noted that Kasey had several good friends. Kasey's mood was good and he related well during the therapy session. Dr. Daniel continued Kasey on Ritalin and Clonidine. (Tr. 386.)

### IV. The ALJ's Decision

The ALJ found that Kasey had never engaged in substantial gainful activity. The ALJ found that Kasey had behavioral/conduct disorder and attention deficit disorder, but that he does not have an impairment or combination of impairments listed in, or medically equivalent to, one listed in Part B or Part A of Appendix 1, Subpart P, Regulations No. 4. The ALJ also found Kasey's impairments not to limit his ability to function independently, appropriately or effectively in an age appropriate manner, except for some moderate concentration and behavioral problems. The ALJ found Kasey's impairments not to substantially reduce his ability to grow, develop or mature physically, mentally or emotionally so as to prevent him from attaining developmental milestones at an age appropriate rate; or engage in age appropriate activities of daily living and self care, play and recreation, school and academics, vocational settings, peer relationships, or family life; or acquiring the skills necessary to assume roles reasonably expected of adults. The ALJ found Kasey not to have an impairment or combination of impairments that is of a severity comparable to an impairment or combination of impairments that would render an adult disabled. Therefore, the ALJ found Kasey not to be under a disability at any time through the date of his decision. (Tr. 32.)

### V. Discussion

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be eligible for Supplemental Security Income under the Social Security Act, a claimant under the age of eighteen must suffer from a medically determinable physical or mental impairment of comparable severity to an impairment that would disable an adult. 20 C.F.R. § 416.924(a). A child's physical or mental impairment or combination of impairments is of "comparable severity" if it so limits the child's ability to function independently, appropriately and effectively in an age appropriate manner that the impairment(s) and resulting limitations are comparable to those which would limit an adult. *Id.* The impair-

ment(s) must substantially reduce the child's ability to acquire the skills needed to assume roles reasonably expected of adults; or grow, develop or mature physically, mentally or emotionally and thus attain developmental milestones at an age appropriate rate; or engage in age appropriate activities of daily living in self care, play and recreation, school and academics, vocational settings, peer relationships, or family life. *Id.*

■■■■ The Commissioner is required to undergo a four-step sequential evaluation process when determining whether a child is entitled to SSI benefits: 1) Is the child engaged in substantial gainful activity; 2) Does the child have a severe impairment; 3) Does the child's impairment meet or equal an impairment listed in Appendix 1 of Subpart P of Part 404 of the regulations; and 4) Is the child's impairment of comparable severity to that of an adult? 20 C.F.R. § 416.924(b)–(f). When a determination that a child is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Hicks v. Shalala,* No. 93–1138, 1994 WL 746600, at *2 (W.D.Ark. Sept. 27, 1994). If the Commissioner reaches the fourth step of the evaluation, he must engage in a functional analysis and inquire into the impact of the child's impairment on the normal daily activities of a child of the claimant's age, such as speaking, walking, dressing, feeding oneself, going to school, and playing. *Sullivan v. Zebley,* 493 U.S. 521, 539–40, 110 S.Ct. 885, 896, 107 L.Ed.2d 967 (1989).

■■■■ The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Young on Behalf of Trice v. Shalala,* 52 F.3d 200 (8th Cir.1995) (citing *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Woolf,* 3 F.3d at 1213; *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992). In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. *Woolf,* 3 F.3d at 1213. Where substantial evidence supports the

Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. *Id.* (quoting *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in that the evidence shows Kasey's impairment of Attention Deficit Hyperactivity Disorder to meet or equal an impairment listed in Appendix 1 of Subpart P of Part 404 of the regulations. Plaintiff further contends that the ALJ erred by failing to consider Kasey's inability to function outside a structured or highly supportive environment.

### A.  Listed Impairments

■■■■ Plaintiff argues that the evidence shows Kasey to suffer from Attention Deficit Hyperactivity Disorder to such a degree that meets or equals an impairment listed in Appendix 1 of Subpart P of Part 404 of the regulations.

To meet the Listing requirements, a child claimant's Attention Deficit Hyperactivity Disorder must be manifested by developmentally inappropriate degrees of inattention, impulsiveness and hyperactivity. Pt. 404, Subpt. P, App. 1 at § 112.11. The required level of severity for this disorder is met when the following requirements are satisfied: Medically documented findings of marked inattention, marked impulsiveness *and* marked hyperactivity, *id.* at § 112.11A, resulting in at least two of the appropriate age-group criteria:

For children (age 3 to the attainment of age 18) . . .

a.  Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings . . . ; or

b.  Marked impairment in age-appropriate social functioning, documented by history and medical findings . . . ; or

c.  Marked impairment in personal/behavioral function, as evidenced by:

(1) Marked restriction of age-appropriate activities of daily living, documented by history and medical findings . . . ; or

(2) Persistent serious maladaptive behaviors destructive to self, others, animals, or property, requiring protective intervention; or

d. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

*Id.* at §§ 112.11B, 112.02B2.

When determining whether a child claimant satisfies any of the age-group criteria, the Commissioner must consider historical and other information from parents or other individuals who have knowledge of the child, if such information is available. *Id.* at § 112.02B2. If necessary, results of appropriate standardized tests are considered to determine whether the child claimant satisfies the age-group criteria. *Id.*

In his decision, the ALJ thoroughly discussed all the evidence before him, including reports of Kasey's mother, teachers, counselors, and physicians, and determined Kasey's condition not to meet the requirements of the Listing of Impairments. Specifically, the ALJ found Kasey's condition to be well controlled by medication noting statements of Kasey's teachers and doctors reporting that Kasey had greatly improved while on Ritalin. The ALJ also noted Kasey to be a happy child and to have friends. The ALJ found that Kasey liked to skateboard and ride bicycles, which the ALJ noted to be normal age appropriate activities. The ALJ found no evidence of limitations relating to cognitive development or cognitive function and noted that Kasey was getting A's and B's while on medication. The ALJ found no evidence of any limitation of Kasey's communicative development or functioning and noted that Kasey was a talkative child and was easy to understand. The ALJ acknowledged Kasey's difficulties with fine motor skills, such as writing, but determined the difficulties to be less than moderate. The ALJ found Kasey to have no problems with social functioning or development noting that Kasey's medi-

cation improved Kasey's behavior in this area. The ALJ noted Kasey's moderate behavior problems, such as difficulty in keeping his hands to himself, but found Kasey's medication to have improved such behavior. In addition, the ALJ noted Kasey to have moderate problems with concentration, persistence and pace, but noted marked improvement in this area with Kasey's medication and utilization of the Resource Room. Finally, the ALJ noted that while Kasey needed a structured setting, he nonetheless was able to engage in age appropriate activities. A review of the record as a whole shows substantial evidence to support the ALJ's conclusion that Kasey's condition was not sufficiently severe to satisfy the requirements of the regulations. *See, e.g., Mote v. Shalala,* No. 93–348–4–MAC (CWH), 1994 WL 485906, at *4–5 (M.D.Ga. May 24, 1994) (good academic progress, doing well in school, participation in activities, having friends, inappropriate behavior controlled by medication, regression when medication ran out or was insufficient, behavior interfering with learning but claimant generally not a behavior problem).

The record supports the ALJ's determination that Kasey's behavioral problems were controlled by Ritalin to such a degree that Kasey's condition is not disabling.[3] Although evidence submitted to and considered by the Appeals Council shows Kasey's behavior to have regressed when his doses of Ritalin were reduced, the undersigned notes that after proper adjustment of Kasey's medication, Kasey's behavior again improved in that Kasey became calm, performed better at school, had several good friends, and related well to others. *Cf. Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). *See also Mote,* 1994 WL 485906, at *4–5.

■ For a child claimant to show that his impairment matches a Listing, all of specified

---

**3.** The undersigned notes that in an unpublished opinion, *Russell v. Chater,* No. 94–2971, 1995 WL 472681, at *1 (8th Cir. Aug. 11, 1995) (per curiam), the Eighth Circuit found similar evidence to support the ALJ's conclusion that the child claimant's impairment did not meet the Listings inasmuch as the claimant's condition was controlled by appropriate dosages of Ritalin. However, the undersigned is aware of Eighth Circuit Rule 28A(k) and does not cite *Russell* as authority for the instant finding that the ALJ's decision is supported by substantial evidence.

medical criteria must be met. *Mote,* 1994 WL 485906, at *3. An impairment that meets only some criteria, regardless of how severely, does not satisfy this requirement. *Id.* (citing *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)). Plaintiff has failed to show that Kasey meets all of the criteria as set out by §§ 112.11 and 112.02B2 of the Listings. To the contrary, there is substantial evidence on the record as a whole which supports the ALJ's findings that Kasey's impairment does not meet or equal an impairment in the Listings. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because evidence may support a different outcome. *Woolf,* 3 F.3d at 1213.

Inasmuch as substantial evidence supports the ALJ's findings, the decision of the Commissioner should be affirmed.

### B. *Structured or Highly Supportive Environment*

■ Plaintiff argues that the ALJ erred by failing to consider Kasey's inability to function outside a structured or highly supportive environment. Plaintiff contends that the ALJ applied an inappropriate legal standard when he found Kasey to need a structured setting but that such a setting did not interfere with Kasey's ability to engage in age appropriate activities.

Pursuant to 20 C.F.R. § 416.924c(d), an ALJ must consider the effect that a structured or highly supportive setting, such as a special classroom or an accommodating regular classroom, may have on children who "spend much of their time" in these settings. If a child claimant's symptoms are controlled or reduced by the environment in which he lives, the ALJ must consider the claimant's ability to function independently, appropriately and effectively in an age appropriate manner outside of this highly structured setting. *Id.*

In the instant case, the evidence supports the ALJ's finding that Kasey participated in regular academic and non-academic activities ninety-two percent of the time. The evidence before the ALJ shows that Kasey spent only thirty minutes each school day in the Resource Room receiving special one-on-one assistance. The evidence also shows that additional time spent in the Resource Room as a disciplinary measure was minimal. The evidence shows that in October 1992, accommodations made for Kasey in his first grade classroom included preferential seating, reduced assigned work, and special instructions or directions. The ALJ noted that in February 1993, Kasey's first grade teacher found that because of Kasey's improvement, he no longer needed behavior management. Although it was continuously noted that Kasey performed better in small groups and needed assistance in task completion, there is no evidence in the record to show that special accommodations in the regular classroom were resumed or necessary. The record overwhelmingly shows that Kasey's behavior and social skills continued to improve while Kasey took his medication. The ALJ discussed Kasey's "dramatic improvement in his school behavior," noting that Kasey was "able to sustain attention, complete tasks, and maintain self-control in a classroom setting." (Tr. 29.) A review of the ALJ's decision shows the ALJ to have considered and discussed the effects of the structured and supportive settings provided to Kasey. In addition, the ALJ considered and discussed Kasey's ability to function in an age appropriate manner outside of these settings.

Evidence presented to and considered by the Appeals Council shows that Kasey's time in a highly structured academic setting was increased from 150 minutes per week to 450 minutes per week prior to February 1994. Although the ALJ did not have this evidence before him at the time he discussed Kasey's ability to function outside structured settings, the undersigned has considered the evidence and determines the ALJ's analysis to continue to be supported by substantial evidence.[4] *See Frankl v. Shalala,* 47 F.3d 935, 939 (8th Cir.1995); *Richmond v. Shala-*

---

4. The undersigned finds it significant that the period during which Kasey's time spent in special education had increased (February 1994) corresponded with the period in which Kasey's dosage of Ritalin had been reduced, thus causing Kasey's behavior and performance to regress (December 1993–February 1994).

 

*la,* 23 F.3d 1441, 1444 (8th Cir.1994) (if Appeals Council considers additional information in denying request for review of ALJ's decision, Court must consider this information in determining whether ALJ's decision was supported by substantial evidence). There is no evidence that Kasey lived in a highly structured environment while at home or elsewhere. The record does not show that Kasey spent "much of [his] time" in such settings or that his symptoms were controlled or reduced by the environment in which he lived so as to require analysis under § 416.924c(d). *Cf. Marine v. Commissioner,* No. 94 CIV. 4577(SS), 1996 WL 97172, at *8 (S.D.N.Y. Mar. 5, 1996) (record showed all of claimant's time to be spent either in special education classes or at home, thus triggering analysis under statute). Although the evidence shows analysis under § 416.924c(d) to be unnecessary here, a reading of the ALJ's decision shows that the ALJ considered and discussed the impact of such structured settings upon Kasey's behavior and ability to function outside these settings. While the plaintiff argues that the ALJ's statement, that Kasey needs a structured setting but that such setting does not interfere with Kasey's ability to engage in age appropriate activities, is a misapplication of the legal standard, the undersigned finds that this isolated statement does not undermine the ALJ's thorough discussion of Kasey's activities and abilities both within and outside structured settings or the conclusion that Kasey was able to participate in age appropriate activities. *Robinson,* 956 F.2d at 841 (inartful drafting is insufficient to set aside finding that is supported by substantial evidence).

The ALJ's findings regarding Kasey's supportive and structured environments, and Kasey's behavior relating thereto, are supported by substantial evidence on the record as a whole. Because the ALJ properly considered and discussed these environments as required by statute, the plaintiff's claim that ALJ failed to do so is without merit.

Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that Kasey is not disabled should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that plaintiff's Motion for Summary Judgment (Docket No. 13) is denied.

**IT IS FURTHER ORDERED** that defendant's Motion for Summary Judgment (Docket No. 14) is granted.

Judgment shall be entered accordingly.